### EUREKA PRODUCING CO. et al. v. COLQUITT et al.*
### No. 12533.

Court of Civil Appeals of Texas. Fort Worth. July 18, 1931.

Rehearing Denied Oct. 10, 1931.

*Writ of error granted.

Fred T. Arnold, of Graham, C. E. Cooper, of Tulsa, Okl., and Geo. L. Kelly, of Wichita Falls, for appellants.

Marshall & King, of Graham, and W. B. Hamilton and Marshall Newcomb, both of Dallas, for appellees.

DUNKLIN, J.

The Eureka Producing Company, the Turman Oil Company, and Joseph Glass and N. T. Gilbert, receivers for those two companies, have appealed from a judgment rendered against them in favor of O. B. Colquitt for the sum of $808, and J. N. Graves for $269.34, as royalties for gas taken by appellants from a certain oil and gas lease, which was a part of a larger lease originally acquired from the state by O. B. Colquitt and his associates, C. F. Colcord and J. N. Graves, on certain river bed lands situated in Young county. Appellants claimed the gas under certain assignments of a portion of that original lease, hereinafter termed the "lease in controversy," by Colquitt and his associates, and the controlling question presented on this appeal is whether those assignments conveyed the gas as well as oil which might be developed from the lease; or whether, as a consideration for those assignments, the appellants became bound to account to the assignors for a royalty of two-eighths of all the gas produced from the lease. On April 12, 1921, Colcord, Graves, and Colquitt, as parties of the first part, entered into a contract in writing with James R. Armstrong, as party of the second part, by the terms of which parties of the first part agreed to execute an assignment to Armstrong of a good and merchantable title to the lease in controversy, and in consideration of that contract, Armstrong agreed "to immediately begin the development of said tract for oil and gas purposes and to diligently prosecute the same by drilling well and otherwise producing oil in a workmanlike and diligent manner. As a further consideration

for this contract and the assignment of the lease heretofore referred to, party of the second part, Armstrong, agrees to pay as royalty or rental the following proportionate part of the oil produced on said tract as follows: one-eighth to the State of Texas, as provided for in the original lease, one-eighth to C. F. Colcord, of Oklahoma City; one-sixteenth to J. N. Graves, of Oklahoma City; one-sixteenth to O. B. Colquitt, of Dallas, Texas."

Two days later and on April 14, 1921, Colcord, Graves, and Colquitt executed to Armstrong an assignment of the lease as they had agreed to do in the written contract. That assignment, after reciting that the assignors had acquired from the state, under permit, title to the lease, contained this provision: "Now, therefore, for and in consideration of One Dollar (and other good and valuable considerations), the receipt of which is hereby acknowledged, the undersigned, the present owners of the said lease and all rights thereunder or incident thereto, do hereby bargain, sell, transfer, assign and convey all rights, title and interest of the original lessee and present owners in and to said lease and rights thereunder in so far as it covers the area and portion of said oil and gas permit as above set forth and described, together with all personal property used or obtained in connection therewith, to James R. Armstrong and his heirs, successors and assigns."

On August 2, 1921, James R. Armstrong executed to the Eureka Producing Company an assignment of the same lease, reading in part as follows: "Know all men by these presents: That I, Jas. R. Armstrong, of Oklahoma City, Oklahoma, for and in consideration of the sum of Ten ($10.00) Dollars, cash in hand paid by Eureka Producing Company, a corporation, the receipt of which is hereby acknowledged, and of other good and valuable consideration, have sold, transferred, conveyed and assigned, and by these presents, do sell, transfer, convey and assign unto the said Eureka Producing Company, all and singular, my oil and gas lease and leasehold estate, right, title and interest in and to the following described tract of land, situated in Young County, State of Texas, which is an undivided five-eighths (5/8ths) interest therein, which said land is more particularly described as follows: * * *"

Then follows a description of the land, with recital of the acquisition from the state by Colquitt and his associates, and with the further recital that "on or about April 21st [12th?], 1921, the said J. N. Graves, O. B. Colquitt and C. F. Colcord assigned said oil and gas lease to James R. Armstrong, reserving a two-eighths (2/8ths) interest therein. * * *"

During the spring and early summer of the year 1921, the Eureka Producing Company drilled three wells on the lease, which did not

produce any gas but produced oil, and Colquitt and his associates received oil royalties from those wells in accordance with the terms of the contract. During the year 1927, a deeper oil sand, known as the Panhandle sand, was discovered on the adjoining lease in a well producing more than 500 barrels of oil a day, and after its discovery Colquitt threatened a forfeiture of the lease held by the Eureka Producing Company unless it drilled a well to that sand. Thereupon, negotiations between the parties followed, as a result of which another contract in writing, of date August 6, 1927, was entered into by and between Colquitt and J. N. Graves as parties of the first part (Colquitt having theretofore acquired the interest of Colcord), and the Eureka Producing Company as party of the second part, reading as follows:

"This contract made and entered into August 6, 1927, by and between O. B. Colquitt and J. N. Graves, both of Dallas, Texas, of the First Part, and Eureka Producing Company, a Delaware Corporation, of the Second Part.

"Witnesseth:

"Whereas, on February 19, 1921, the State of Texas, acting by and through J. T. Robison, Commissioner of the General Land Office in said State, under the laws of said State, did grant and lease unto O. B. Colquitt and J. N. Graves, the following described lands;

"Oil and gas permit No. 2825, granting them the right to prospect for oil and gas in 1822½ acres of land situated in Young County, Texas, said area embracing 250 acres of the Bed of Clear Fork of the Brazos River, the field notes of which are recorded in book A-2, page 160, of the Surveyor's Records of Young County; also 1412½ acres of the Brazos River Bed, the field notes of which survey are recorded in book A-2, page 149 of the Surveyor's Records of Young County; also section 10, Brazos River Indian Reservation, containing 160 acres, making a total of 1822½ acres, for a term of ten years, with the right of renewal or renewals, together with the right to enter upon said lands at all times during the life of said lease for the purpose of mining, drilling and operating for oil and gas. Said lease was filed for record February 24, 1921, and recorded in volume 87, page 257, of the Deed Records of Young County, Texas; and

"Whereas, pursuant to a certain contract made and entered into April 12, 1921, filed for record May 6, 1921, recorded in volume 85, page 190 of the Deed Records of Young County, Texas, by and between C. F. Colcord, J. N. Graves and O. B. Colquitt, First Parties, and James R. Armstrong, Second Party, said C. F. Colcord, J. N. Graves and O. B. Colquitt assigned all the right, title and interest of the original lessee and present owner in and to the above described lease, and all rights thereunder insofar as it covers the following area and portion of said oil and gas lease above described, towit:

"A certain sector of the Clear Fork of the Brazos River, a tributory of the Brazos River in Young County, Texas;

"Beginning at a point on the Clear Fork of the Brazos River, it being at a line projected across the rvier at a point where the south line of what is described as the Graham Oil Syndicate lease of the Graham land on the Tankersley Survey;

"Thence up the river, including the land described in a lease from the State of Texas to O. B. Colquitt and J. N. Graves for a distance from the point above described on the Clear Fork of the Brazos River up the river equal to the distance from the North line projected across the river of the Graham Oil Syndicate lease of the Tankersley survey up the river to a line projected across the river up to the south line of the Graham oil lease on the Tankersley survey.

"The original lease is described in permit No. 2825, of the General Land Office of the State of Texas, said permit being granted January 24, 1919, to O. B. Colquitt and J. N. Graves, said lease under said permit being dated February 19, 1921, which lease was subsequently assigned to the Seaboard Oil & Gas Company and by the Seaboard Oil & Gas Company to O. B. Colquitt, J. N. Graves and C. F. Colcord, and subsequently assigned by O. B. Colquitt, J. N. Graves and C. F. Colcord to J. M. Noble and E. E. Westervelt, who later assigned to O. B. Colquitt and J. N. Graves; and subsequently O. B. Colquitt and J. N. Graves assigned to O. B. Colquitt, J. N. Graves and C. F. Colcord: together with all personal property used or obtained in connection therewith, free and clear from all liens and encumbrances, to James R. Armstrong. Said assignment was executed April 14, 1921, and filed for record May 31, 1921, Volume 87, page 561 of the Deed Records of Young County, Texas; and,

"Whereas, in and by the terms and conditions of said contract made and entered into by and between said C. F. Colcord, J. N. Graves and O. B. Colquitt, First Parties, and James R. Armstrong, Second Party, under date of April 12th, 1921, it was agreed that said James R. Armstrong should pay the following proportionate part of the oil produced and saved on said tract of land above described as follows:

"1/8 Royalty to the State of Texas, as provided in the original lease;

"1/8 Overriding royalty to C. F. Colcord, of Oklahoma City;

"1/16 Overriding royalty to J. N. Graves, of Oklahoma City;

"1/16 Overriding royalty to O. B. Colquitt, of Dallas, Texas; and,

"Whereas, said O. B. Colquitt has acquired the 1/8 overriding royalty interest of C. F. Colcord, above mentioned, and is now the present owner thereof; and,

"Whereas, said J. N. Graves is the present owner of 1/16 overriding royalty interest and O. B. Colquitt the present owner of 3/16 overriding royalty interest in and to the above described oil and gas mining lease; and,

"Whereas, on August 2nd, 1921, James R. Armstrong assigned, transferred and delivered to the Eureka Producing Company, all his right, title and interest in and to the above described oil and gas mining lease, which said assignment was filed November 14th, 1921, recorded in Volume 90, Page 423, of the Deed Records of Young County, Texas.

"Now, Therefore, in consideration of the sum of Ten ($10) Dollars, cash in hand paid by second party to first parties, the receipt whereof is hereby acknowledged, and the mutual covenants and agreements hereinafter contained, it is agreed between the parties hereto, as follows:

"I. O. B. Colquitt and J. N. Graves, first parties, agree and do by these presents, release, surrender, assign and deliver to the Eureka Producing Company, Second Party, one-half of their overriding royalty interest, above described, in and to said oil and gas mining leasehold, above described, the same being apportioned as follows:

"3/32 released and assigned by O. B. Colquitt to the Eureka Producing Company, leaving said O. B. Colquitt a remaining interest of 3/32;

"1/32 released and assigned by J. N. Graves to the Eureka Producing Company, leaving J. N. Graves a remaining interest of 1/32, and

"Further, do hereby assign, transfer, surrender and deliver all their right, title, claims and interest in and to the above described area out of oil and gas mining lease No. 2825, except the overriding royalty interests herein reserved.

"II. The Eureka Producing Company agrees to drill one well on the North end of said lease to the oil sand from which the Panhandle well No. 7 is producing, encountered at a depth of approximately 4200 feet, unless oil or gas in paying quantities is found at a lesser depth, drilling operations to be started as soon as equipment and materials can be placed on said lease, and prosecuted with due diligence until completion.

"The Eureka Producing Company further agrees to drill two additional wells on said lease to the same sand, if it deems conditions warrant said drilling.

"III. First Parties further agree that if production is obtained from the first well, Second Party shall be entitled to receive Eight Thousand ($8,000.00) Dollars out of the first oil produced and saved from the 7/8ths' working interest, before the parties of the first part shall receive any overriding royalty, and in like manner, Second Parties shall be entitled to receive $8,000.00 out of the first oil produced from the 7/8ths' working interest from each succeeding well drilled thereon, before First Parties shall receive any overriding royalties.

"IV. This contract shall be binding on the heirs, executors, administrators and assigns of the parties hereto.

"In Witness whereof the Parties hereto have hereunto set their hands, the day and year first above written.

"[Signed] O. B. Colquitt<br>
"[Signed] J. N. Graves<br>
"First Parties,<br>
"Eureka Producing Company,<br>
"By William Tallman<br>
[Signed] President.<br>
"Second Party.

"Attest:

"P. Rohrbach, Secretary. [Corporate Seal.]"

In plaintiffs' pleadings it was alleged that at the time Colquitt and his associates executed to Armstrong the contract, of date April 12, 1921, and at the time they later assigned the lease in controversy to Armstrong in pursuance of that contract, it was mutually agreed and understood by the parties to those instruments that as a consideration therefor Colquitt and his associates should receive an overriding royalty of two-eighths of the gas produced from that lease, as well as the overriding royalty provided for in that contract for the oil produced, and that said agreement and understanding was omitted from those instruments by mutual mistake of the parties thereto. Based upon those allegations there was a prayer for a reformation of those instruments so as to embody the agreement so made and omitted therefrom.

There was no allegation of mutual mistake in the drafting of the contract of date August 6, 1927, between Colquitt and Graves and the Eureka Producing Company, copied above. Nor was there any prayer for a reformation of that contract.

There were further allegations in plaintiffs' petition that all three of the instruments last referred to have at all times been construed by Colcord and his associates, James R. Armstrong and the Eureka Producing Company, as having the legal effect to reserve to Colcord and his associates an overriding royalty in the gas as well as in the oil produced from the lease in controversy.

The case was tried without a jury, and from recitals in the judgment it appears that the trial judge failed to sustain plaintiffs' allegations of mutual mistake and to decree a reformation of the two instruments executed by Colcord and his associates to Armstrong,

noted above, although there was evidence tending to sustain such a finding; but concluded and found that under the terms of the two contracts between Colcord and his associates and Armstrong and the later contract, of date April 6, 1927, set out above, the plaintiffs were entitled to the same royalty in the gas produced from the lease in controversy as is stipulated for oil.

The plaintiffs did not except to the court's refusal of their plea for reformation of the contract between Colcord and his associates and Armstrong, of date April 12, 1921, and of the assignment to Armstrong pursuant to that contract. Nor have they presented any cross-assignment in this court to that ruling.

■ It therefore follows that the first and pivotal question to be determined here is whether or not the court erred in so construing the contracts, which is a question of law to be determined from the authorities solely from the terms of those instruments themselves.

■ The contract of April 12, 1921, between Colcord and his associates and Armstrong, and the assignment thereafter executed to Armstrong on April 14, 1921, in pursuance of that contract, had the legal effect to convey to Armstrong the entire leasehold interest acquired by Colcord and his associates from the state, with only a reservation of a royalty in the oil, and that leasehold interest was duly assigned by Armstrong to the Eureka Producing Company. Our conclusion is that the terms of those instruments do not present any ambiguity with respect to that question, nor did the plaintiffs in their suit allege that the same were ambiguous. Hence, we will say at the outset that the testimony introduced by plaintiffs to show a practical construction by the parties in interest of those instruments, and also of the instrument of date August 6, 1927, as having the legal effect of reserving to Colcord and his associates of a royalty interest in the gas as well as in the oil, cannot be given any effect, since the same was in violation of the parol evidence rule, which is a rule of substantive law.

■ In Heidenheimer v. Cleveland, 17 S. W. 524, 528, our Supreme Court used this language: "Where a contract is not of doubtful interpretation, and its terms are free of ambiguity, the practical interpretation thereof by the parties cannot alter its legal force and effect."

Many other authorities might be cited to the same effect, such as Soell v. Hadden, 85 Tex. 182, 19 S. W. 1087; Guarantee Life Ins. Co. v. Davidson (Tex. Com. App.) 234 S. W. 883; Ranger Cisco Oil Co. v. Cons. Oil Co. (Tex. Civ. App.) 239 S. W. 648; Philadelphia, W. & B. Ry. Co. v. Trimble, 10 Wall. (77 U. S.) 367, 19 L. Ed. 948; Russell v. Young, 94 F. 45 (6 C. C. A. 1899); Hammon Consol. Gold Fields v. Powell, 32 F.(2d) 855 (9 C. C. A. 1929); Tustin v. Phil. & Read. Coal & Iron Co., 250 Pa. 425, 95 A. 595; Twin Tree Lumber Co. v. Ensign, 193 Ala. 113, 69 So. 525; Ingraham v. Mariner, 194 Ill. 209, 62 N. E. 609; Henry v. Phillips, 105 Tex. 459, 151 S. W. 533.

■ It is a well-settled rule in this state that a lease for oil and gas purposes is an interest in realty, and a contract of conveyance of the same must be in writing as required by the statutes (Rev. St. 1925, art. 3995); and any reservation of title in an instrument purporting to convey the whole must likewise be in writing. Nor was evidence admissible to show the understanding between the parties that Colcord and his associates should receive an overriding royalty of the oil and gas, upon the theory that it was a part of the consideration for the transfer, since that testimony would contradict the terms of the instrument conveying the entire leasehold interest with the sole exception of the royalty reserved in oil. Kahn v. Kahn, 94 Tex. 114, 58 S. W. 825; Houston, E. & W. T. R. Co. v. Browder (Tex. Civ. App.) 265 S. W. 227; Id. (Tex. Com. App.) 283 S. W. 154; Poteet v. Imboden, 77 W. Va. 570, 88 S. E. 1024; Teague v. Teague, 31 Tex. Civ. App. 156, 71 S. W. 555; Sullivan & Co. v. Schreiner (Tex. Civ. App.) 222 S. W. 314, and other authorities there cited.

The following is quoted from Tiffany on Real Property, vol. 2, p. 1631: "As it is not permissible to introduce evidence as to the consideration in contradiction of the consideration clause in so far as such clause is contractual in character, or is otherwise intended to have a legal effect, so it is not permissible to introduce evidence as to the consideration in contradiction of any other clause which is contractual in character or intended to have a legal effect. Accordingly, the language of the instrument being such as to vest in the grantee an estate free from any condition subsequent or limitation over, it cannot be shown, under the pretext of proving the real consideration, that there was such a condition or limitation. And for the same reason, it appears, one cannot, after purporting to convey land, restrict the operation of the instrument by introducing evidence that it was agreed, as part consideration of the conveyance, that some part of what would otherwise pass by the conveyance, the growing crop for instance, or fixtures, should not pass. And the oral reservation of an easement cannot be asserted under the pretext of showing the consideration."

■ The designation in the assignment by Armstrong to the Eureka Producing Company, dated August 2, 1921, of interest to be conveyed as an undivided five-eighths interest in the lease, could not be given the effect

259

of limiting the estate conveyed by the preceding language conveying "all my oil and gas lease and leasehold estate, right, title and interest in and to the following described tract of land"; and as further limiting the interest assigned to the Eureka Producing Company by Colquitt and Graves in the contract of August 6, 1927, as shown by this language, following the stipulation for the overriding royalty, that Colquitt and Graves "further do hereby assign, transfer, surrender and deliver all their rights, title, claim and interest in and to the above described area out of oil and gas mining lease No. 2825, except the overriding royalty interests herein reserved." 18 Corpus Juris, pp. 286–290–292; 8 R. C. L. p. 1083, par. 137; Tiffany on Real Property, vol. 2, p. 1671.

It is to be noted further that all the interest which had been acquired by Armstrong had been assigned to the Eureka Producing Company prior to the execution of the contract of August 6, 1927. We have therefore concluded that the trial court erred in admitting the testimony offered by the plaintiffs to prove the parol agreement between the parties to the contract of April 12, 1921, to the effect that as a consideration for the lease to be assigned by Colcord and his associates, they should receive an overriding royalty for gas produced in the same proportion as for oil, and in rendering judgment in favor of plaintiffs for the amount of such royalty interest in the gas.

 Appellees insist that the evidence conclusively establishes the alleged mutual mistake between the parties to the contract of April 12, 1921, and the assignment of the lease to Armstrong pursuant to that contract, and that this court should affirm the judgment, notwithstanding appellees have not assigned error to the failure of the court to decree a reformation of those contracts. We are unable to concur in that view, even though we should agree with appellees in their contention as to the weight of the evidence on that issue, which is challenged by appellants in one of their assignments of error and the merits of which it is not necessary for us to determine for the following reasons. One of the defenses pleaded by appellants to the prayer for a reformation of those instruments was the statute of limitation of four years, to wit, article 5529, Rev. Civ. Statutes of 1925. The evidence showed that plaintiffs' suit was instituted more than eight years after the execution of those instruments, and the only excuse offered by plaintiffs for their failure to sooner sue to correct the alleged mistake was the testi-

mony of plaintiff Colquitt, to the effect that he did not carefully read the contract of April 12, 1921, before he signed it, and signed it believing that it embodied a reservation of the same royalty in gas as in oil; although he admitted that the contract as finally executed was a redraft of one that had been previously prepared and which he had examined. Appellants have cited numerous authorities to sustain their said defense of limitation, such as Cleveland State Bank v. Gardner (Tex. Com. App.) 286 S. W. 173; Curry v. Texas Co. (Tex. Civ. App.) 8 S.W. (2d) 206; Pyron v. Brownfield (Tex. Civ. App.) 238 S. W. 725. And they have cited other authorities to support their defense in equity of waiver by laches in failing to sooner move for a reformation of the contract, such as Los Angeles Heights Ind. School Dist. v. Chestnut (Tex. Civ. App.) 287 S. W. 693; Reese v. Carey Bros. (Tex. Civ. App.) 286 S. W. 307; Patterson v. Hewitt, 195 U. S. 309, 25 S. Ct. 35, 49 L. Ed. 214; Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 328; Walker-Lucas-Hudson Oil Co. v. Hudson, 168 Ark. 1098, 272 S. W. 836, by the Supreme Court of Arkansas.

We are unable to say that the trial court overruled those defenses to the plaintiffs' suit for a reformation of those instruments. On the contrary, it might be inferred that the failure of the court to grant the reformation prayed for was by reason of one of the other of those defenses; and whether or not such possible ruling was correct is not before us for determination.

Plaintiffs sought to avoid the plea of limitation, upon the theory that proof of a parol agreement to pay royalties for gas was admissible under the rule that the true consideration may be proven by parol testimony whenever the same does not contradict the terms of the written instrument, and that their cause of action for the recovery of the royalties sued for was not barred by limitation, since the same did not accrue until after the production of the gas and the refusal of defendants to account to plaintiffs therefor, all of which occurred far short of the four years' period of limitation invoked by the defendants. But by reason of the conclusions already expressed, we do not believe that contention to be tenable.

Accordingly, we have concluded that the judgment of the trial court should be reversed in its entirety and that judgment should be here rendered that appellees take nothing of appellants, and it is accordingly so ordered; without the necessity of a determination of other assignments presented by appellants.